**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**JANE DOE**, *individually and as parent and next friend of* **MINOR PLAINTIFF 1** and **MINOR PLAINTIFF 2**, *minors, and on behalf of all others similarly situated to herself and Minor Plaintiffs*,

Plaintiffs,

**v.**

**DAYTON CHILDREN'S HOSPITAL,** and **DOE DEFENDANTS 1 through 100**,

Defendants.

Case No. 3:26-cv-00422

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jane Doe ("Plaintiff"), individually and as parent and next friend of Minor Plaintiff 1 and Minor Plaintiff 2 (collectively "Minor Plaintiffs"), minors (Plaintiff and Minor Plaintiffs collectively, "Plaintiffs"), and on behalf of all others similarly situated to herself and Minor Plaintiffs (the "Class"), bring this putative class action against Dayton Children's Hospital ("Dayton Children's") and Does 1 through 100 ("Doe Defendants") (collectively, "Defendants"). Plaintiffs seek to bring this action pseudonymously in order to protect the identity of minor children, as well as Plaintiffs' privacy in relation to their protected health information, and will file a motion for leave to do so upon filing of this Complaint.

For their Class Action Complaint against Defendants, Plaintiffs allege upon personal knowledge as to matters directly pertaining to themselves and upon information and belief as to all other matters derived from, among other things, investigation of counsel and review of public documents, as follows:

## NATURE OF THE ACTION

1. Families expect that what a child and a parent tell a child's doctors is supposed to stay in the exam room. That promise and expectation is at its strongest in a children's hospital, where the patients are children and where parents speak for them and beside them about the most intimate details of a child's body, mind, and life. Since early to mid-2025, Defendants have broken that promise. They have let an outside technology company listen in on, record, and keep what pediatric patients and their parents tell their doctors (their symptoms, their diagnoses, their mental health, their family medical histories) without telling them that a stranger to the child's care was capturing every word.

2. That stranger is Abridge AI, Inc. Defendants put its artificial intelligence ("AI") recording tool, called "Abridge," in their exam rooms. Once a clinician switches it on, Abridge records the entire conversation between a pediatric patient and clinician (or a pediatric patient, their parents, and clinician) and sends it out of the building to Abridge AI, Inc.'s servers. The conversations do not stop there. Upon information and belief, Abridge AI, Inc. keeps them and feeds them into the training of its own commercial AI models, turning a child's and their family's most private disclosures into raw material for its products. Once a conversation is used to train a model, it cannot be taken back.

3. Some were told nothing at all. Others heard, at most, a passing reference to an artificial intelligence tool, without being told what the tool was, where the recording would go, who would have access to it, or what would be done with it. Neither group agreed to what actually happened.

4. A hospital cannot unilaterally decide to record a conversation and hand that recording to an outside company to keep and use for its own purposes. Ohio law has long

recognized that healthcare providers like Defendants owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without consent. Federal and Ohio law both forbid intercepting a private conversation for a criminal or tortious purpose, including the unlawful disclosure of patients' health information, even where one party to the conversation consents. Defendants gave pediatric patients and their parents no meaningful notice and obtained no informed consent.

5. Plaintiff is one of those parents and her children, Minor Plaintiffs, are each one of those patients. Behind the closed doors of Dayton Children's exam rooms, Plaintiff and her children shared their most sensitive health information with pediatric providers. Unbeknownst to them, the clinicians activated Abridge, which captured the conversation in full and sent it to Abridge AI, Inc. Defendant never obtained Plaintiffs' consent.

6. The harm is real, and it falls on children and their families. Plaintiffs and Class Members have lost the ability to trust that what they tell their doctors stays private. They have suffered distress knowing a child's health information was handed to a stranger and used to build a stranger's technology. They paid for confidential care they did not receive. And their child's health information now sits with a third party, indefinitely and outside the family's control.

7. This was not a one-off lapse. It was Defendants' policy, applied across their hospitals and clinics, as early use of Abridge had already scaled to 25% utilization across their providers by May 2025.[1] Thereafter, on information and belief, Defendants continued to implement Abridge in a clinic-by-clinic structured rollout. And Defendants' silence was a choice. A clear disclosure—that the entire conversation would be recorded, sent to an outside company,

---

[1] *Dayton Children's now uses AI; Here's how it works*, WHIOTV7 (May 27, 2025), https://www.whio.com/news/local/dayton-childrens-now-uses-ai-how-it-works/7PKVQUPPPBFLHDQBHMYRZNPG4U/ (last visited Nov. 19, 2026).

and potentially used to build that company's products—would have led many parents, guardians, and/or patients to say no. Silence let Defendants deploy that technology without the friction, delay, or refusals that honest disclosure would have invited.

8. Plaintiffs bring this action to hold Defendants accountable for that choice. On behalf of themselves and a Class of similarly situated persons, Plaintiffs assert the following statutory and common law claims against Defendants: violations of the Federal Wiretap Act, Title I of the Electronic Communications Privacy Act (18 U.S.C. § 2510 *et seq.*); violations of the Ohio Wiretap Act Ohio Rev. Code Ann. § 2933.51 *et seq.*); breach of confidence; common law invasion of privacy (intrusion upon seclusion); breach of contract implied in fact; and breach of contract implied in law.

## PARTIES

### A. PLAINTIFFS

***Plaintiff Jane Doe***

9. Plaintiff Jane Doe is, and at all times relevant to this action has been, a citizen and resident of Montgomery County, Ohio.

10. Plaintiff is the parent and legal guardian of Minor Plaintiff 1 and Minor Plaintiff 2.

11. Plaintiff brings this action in her personal capacity and as next friend of Minor Plaintiffs, and on behalf of the following putative Class: all individuals whose health information and/or communications were recorded by or disclosed to Abridge or a comparable ambient AI documentation tool during the relevant class period.

***Minor Plaintiff 1***

12. Minor Plaintiff 1 is, and at all times relevant to this action has been, a citizen and resident of Montgomery County, Ohio, and a minor child of Plaintiff Jane Doe under her legal custody.

***Minor Plaintiff 2***

13. Minor Plaintiff 2 is, and at all times relevant to this action has been, a citizen and resident of Montgomery County, Ohio, and a minor child of Plaintiff Jane Doe under her legal custody.

***Plaintiffs' Experience***

14. Plaintiff sought care, including mental health care, for Minor Plaintiff 1 on numerous occasions from Defendant-affiliated providers, at Dayton Children's main campus facility, over the course of several months, including his latest visit on or about August 6, 2026.

15. Plaintiff also sought care for Minor Plaintiff 2 on numerous occasions from Defendant-affiliated providers, including visits for general pediatric services and emergency services.

16. Plaintiff paid for these visits for her children, directly and/or through health insurance.

17. At each one of those visits, Plaintiffs placed trust in Defendants to safeguard the confidentiality owed to every patient who walks through their doors.

18. Plaintiffs' consultations and conversations occurred where every patient and their parents have the right to expect privacy: behind closed doors, in a private exam room, and away from the public view.

19. During those visits, Plaintiffs disclosed sensitive medical information—the kind of information patients and their parents or guardians share only because they believe it will stay between themselves and their provider.

20. Unbeknownst to Plaintiffs, Defendants were recording using the Abridge tool. No one told them, before or during the visit, that the Abridge tool was listening, capturing, and preserving every word spoken in the room—the child's, the provider's, and Plaintiff's own—and

then sending that information to Abridge AI, Inc. for its own use. No one asked Plaintiff for consent to record her or her children; nor did they ask for Minor Plaintiffs' consent. Still, Defendants recorded anyway.

21. The betrayal was not abstract. Plaintiff and each of her children shared deeply personal information under the reasonable—legally protected—assumption that the conversation would remain confidential. Instead, Defendants routed it to an outside company and locked it into a permanent record, without so much as a word of warning. That discovery inflicted real emotional distress and left Plaintiffs with the lasting, justified belief that Defendants valued operational convenience over the privacy of their pediatric patients they were duty-bound to protect. Plaintiffs' experiences reflect the absence of adequate consent architecture, as described more fully below in the Statement of Facts, Section D ("The Consent Gap").

22. Plaintiffs were not told that:

a. The conversation would be recorded and transmitted to a third-party vendor, Abridge AI, Inc., outside of Defendants' own systems;

b. The recording would capture the full, unfiltered conversation—including all sensitive medical information discussed during the entire patient encounter—rather than a summary or limited excerpt;

c. The recording, transcript, or data derived from it might be used by Abridge to train, evaluate, or improve its own artificial-intelligence models for Abridge's independent commercial benefit; or

d. There was any meaningful ability to decline, or to later revoke consent and compel deletion of the recording, without affecting the care that Plaintiff's children received.

23. A parent, guardian, or patient cannot consent to what they are never told. Defendants failed to disclose the specifics a reasonable patient would need to make an informed choice.

24. Had Plaintiff been told what was actually going to occur—that the conversation

would be captured in full, handed to an outside company for processing and, upon information and belief, used to train that company's own commercial AI models—Plaintiff would have refused or taken steps to protect both her children's privacy and her own.

## B. DEFENDANTS

***Defendant Dayton Children's Hospital***

25. Defendant Dayton Children's Hospital is an Ohio nonprofit corporation with its principal place of business at One Children's Plaza, Dayton, Ohio 45404. Dayton Children's operates hospitals, outpatient clinics, and physician practices throughout Western Ohio.

26. At all relevant times, Dayton Children's Hospital operated as an integrated healthcare system under the unified "Dayton Children's" brand and presented itself to patients and their parents or guardians as a single, unified provider of care. Upon information and belief, each of Dayton Children's affiliated hospitals, clinics, physician practices, and related entities acted as Dayton Children's agent, apparent agent, partner, joint venturer, alter ego, servant, employee, or representative, and acted within the course and scope of that relationship in deploying the Abridge system, recording patient visits, transmitting medical information to Abridge AI, Inc., and failing to implement adequate consent and authorization protocols.

27. The acts and omissions alleged herein were authorized, ordered, directed, ratified, or approved by Dayton Children's officers, directors, managing agents, or corporate decision-makers. To the extent discovery establishes that any related or affiliated entity participated in, directed, or benefitted from the conduct alleged herein, that entity is jointly and severally liable, together with Dayton Children's, for the conduct described in this Complaint.

***Doe Defendants***

28. The true names and capacities of Defendants sued as Doe Defendants 1 through

100 are unknown to Plaintiffs at this time. Plaintiffs will amend this Complaint to state the true names and capacities of these Defendants when ascertained.

29. Upon information and belief, Doe Defendants include managing agents who approved deployment of the Abridge system without compliant consent or authorization protocols; IT and Clinical Informatics personnel who configured the system to transmit audio and transcripts to Abridge AI, Inc.; and vendor-facing personnel who implemented or approved retention practices that lack effective deletion-on-demand.

30. Each Doe Defendant is legally responsible, in whole or in part, for the acts and omissions alleged herein.

## JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Count I arises under the Federal Wiretap Act, 18 U.S.C. § 2510 et seq., and supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy. Alternatively, this Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because: (a) the proposed Class consists of more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because, upon information and belief, at least one member of the proposed Class is a citizen of a state other than Ohio. Defendants' Dayton-area facilities and Defendants' other facilities throughout a large corridor of Western Ohio routinely provide care to pediatric patients who reside outside of Ohio, including Indiana.

32. This Court has general personal jurisdiction over Dayton Children's because it is incorporated and headquartered in Ohio. This Court also has specific personal jurisdiction over

Defendants because Plaintiffs' and Class Members' claims arise out of Defendants' Ohio-based conduct, including the recording, interception, and transmission of protected health information from patient encounters at Defendants' Ohio facilities.

33. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including Defendants' deployment and operation of the Abridge ambient AI documentation system at Defendants' facilities located within this District, and because Defendants reside in, and are subject to personal jurisdiction in, this District within the meaning of 28 U.S.C. § 1391(c).

## STATEMENT OF FACTS

### A. WHAT IS ARTIFICIAL INTELLIGENCE AND AMBIENT CLINICAL DOCUMENTATION TECHNOLOGY?

34. Before describing what Defendants did, it is useful to explain, in ordinary terms, what the technology at issue actually is: what "artificial intelligence" means, how the particular kind of artificial intelligence used by Abridge learns to do what it does, and how that technology is assembled into a tool that can sit in an exam room and turn a spoken conversation into a written medical note.

35. "Artificial intelligence," or "AI," is a broad term for computer systems that are built to produce outputs—such as a prediction, a recommendation, a translation, or, as relevant here, a written summary of a conversation—from the inputs they are given.[2] An AI system does not "think" the way a person does. It is, in essence, a mathematical model: a very large collection of

[2] Nat'l Inst. of Standards & Tech., U.S. Dep't of Commerce, *Artificial Intelligence Risk Management Framework (AI RMF 1.0)*, NIST AI 100-1 (Jan. 2023), https://doi.org/10.6028/NIST.AI.100-1 (last visited Nov. 19, 2026).

adjustable numerical values, called parameters, that determine how a given input is converted into an output.[3] Before it is put to use, an AI model is "trained"—meaning its parameters are repeatedly adjusted, using large quantities of example data, until the model reliably produces the kind of output its developer wants.[4] In simplified terms, the model is not told a set of rules to follow; it is shown enormous amounts of data and, through that process, comes to reflect the statistical patterns contained in that data.

36. The particular family of AI systems relevant to this case is known as "large language models," or "LLMs."[5] An LLM is an AI system trained specifically on language—text, and, when paired with the technologies described below, transcribed speech—with the goal of producing a useful digital representation of how language works.[6] LLMs are described as "large" because of a well-documented pattern in AI research: models trained on more data, using more computing power and more parameters, consistently perform better than smaller models trained on less.[7] That pattern has a direct and important consequence for this case: a company that develops an LLM has a built-in commercial incentive to acquire as much high-quality, real-world training data as it can, because that data is what allows its models to improve.[8] Familiar examples of consumer-facing tools built on LLMs include OpenAI's ChatGPT, Anthropic's Claude, and

---

[3] Helen Toner, *What Are Generative AI, Large Language Models, and Foundation Models?*, Ctr. for Sec. & Emerging Tech. (May 12, 2023), https://cset.georgetown.edu/article/what-are-generative-ai-large-language-models-and-foundation-models/ (last visited Nov. 19, 2026).

[4] *Id.*

[5] Cong. Research Serv., IF12426, *Generative Artificial Intelligence: Overview, Issues, and Considerations for Congress* (Apr. 2, 2025), https://www.congress.gov/crs-product/IF12426 (last visited Nov. 19, 2026).

[6] Toner, *supra* note 3.

[7] *Id.*; Cong. Research Serv., IF12426, *supra* note 5.

[8] Toner, *supra* note 3.

Google's Gemini; the same underlying technology, applied to a different task, is what allows a system like Abridge to convert a spoken doctor-patient conversation into a written clinical note.

37. A related term, "foundation model," refers to an AI system—typically an LLM—that is trained to have broad, general capabilities and can then be adapted, or "fine-tuned," for a range of more specific downstream purposes.[9] As alleged in Section C below, Abridge AI, Inc.'s publicly announced work to build a foundation model for clinical conversations, in partnership with Nvidia, is an example of this concept in practice: a broad, general-purpose model, trained on large volumes of data, that can then be adapted to a specific commercial application.

38. A second, distinct technology is required before an LLM can be used on a spoken conversation at all: the spoken words must first be converted into text. This is done by "automated speech recognition," or "ASR," software, which listens to audio and transcribes it.[10] Ambient clinical documentation tools like Abridge combine ASR with an LLM (and, often, an intermediate layer of natural-language-processing software that identifies and organizes the clinically relevant portions of the transcript): the ASR component turns the spoken visit into text, and the LLM component then reads that text and generates a structured clinical note from it, typically organized in a standard format used throughout medicine.[11]

39. Tools that combine these components—a microphone, ASR, and an LLM—to passively "listen" to an entire patient encounter and automatically draft a note are commonly

---

[9] Cong. Research Serv., IG10077, *Artificial Intelligence (AI) Taxonomy* (Apr. 25, 2025), https://www.congress.gov/crs-product/IG10077 (last visited Nov. 19, 2026); Toner, *supra* note 3.

[10] Mahshad Razaghi et al., *Transforming Clinical Documentation with Ambient Artificial Intelligence (AI) Scribes: A Narrative Review of Technology, Impact, and Implementation*, 16 Cardiovasc. Diagn. & Ther. 11 (2026), https://doi.org/10.21037/cdt-2025-454 (last visited Nov. 19, 2026).

[11] *Id.*; Aaron A. Tierney et al., *Ambient Artificial Intelligence Scribes to Alleviate the Burden of Clinical Documentation*, 5 NEJM Catalyst Innovations Care Delivery, CAT.23.0404 (2024), https://doi.org/10.1056/CAT.23.0404 (last visited Nov. 19, 2026).

referred to in the medical and technology literature as "ambient AI scribes" or "ambient AI documentation" tools.[12] Unlike a clinician manually typing or dictating selected observations into a chart, an ambient AI scribe is, by design, built to capture the full, unfiltered conversation as it happens, because the underlying LLM needs the complete transcript—not a curated summary—in order to generate an accurate note.[13] Abridge is precisely this kind of technology.

40. Two additional technical characteristics of this technology bear directly on the harms alleged in this Complaint. First, because an LLM's usefulness depends on the volume and realism of the data it is trained on, recordings of actual clinical encounters—real patients describing real symptoms to real physicians—are a particularly valuable category of training data for a company like Abridge AI, Inc., which is why a vendor supplying an ambient AI scribe to a hospital has an independent commercial interest in using the resulting conversational data for its own model development, separate and apart from the task of generating any single patient's clinical note.

41. Second, once a piece of data has been used to adjust an AI model's parameters through training, the specific contribution of that data point is, by the nature of how these models are built, difficult to isolate and remove after the fact; deleting a source recording does not necessarily undo the effect that recording already had on a model's parameters.[14] Relatedly, data-privacy researchers have demonstrated that stripping the explicit identifiers from a dataset—the traditional method of "de-identifying" data—does not reliably prevent that data from later being tied back to a specific person, because modern statistical and machine-learning techniques can

[12] Razaghi et al., *supra* note 10; Tierney et al., *supra* note 11.

[13] Razaghi et al., *supra* note 10.

[14] Toner, *supra* note 3 (describing training as an iterative process of adjusting a model's parameters using training data).

exploit correlations between the remaining, ostensibly anonymous details to re-identify individuals with a high degree of accuracy.[15] Both characteristics are directly relevant to the adequacy of the notice and consent required when using this technology in a healthcare setting.

42. Health systems that deploy AI vendors' tools can and do negotiate contractual terms prohibiting the vendor from retaining patient data beyond what the service requires or using it to train the vendor's own models.

43. It is against this technical backdrop (an AI system that must be trained on real data to function, that improves with more of that data, and that cannot simply "forget" data once it has been used) that Defendants decided to deploy an ambient AI documentation tool in their exam rooms without properly informing their patients.

**B. DEFENDANTS' USE OF ABRIDGE**

44. Upon information and belief, beginning no later than May 2025, Defendants rolled out the Abridge ambient AI documentation tool across their clinical operations. Once a clinician activates it on a phone, tablet, or similar microphone-enabled device, it listens continuously through the visit, sends the audio to Abridge's infrastructure for processing, and returns a draft note that gets folded into the patient's chart in Defendants' electronic health record ("EHR") system.

45. Unlike traditional medical documentation—where a physician manually records relevant information during or after a consultation—the Abridge system electronically records the live oral communication itself. The platform captures the substance of what both the patient and

---

[15] Luc Rocher, Julien M. Hendrickx & Yves-Alexandre de Montjoye, *Estimating the Success of Re-Identifications in Incomplete Datasets Using Generative Models*, 10 Nature Commc'ns 3069 (2019), https://doi.org/10.1038/s41467-019-10933-3 (last visited Nov. 19, 2026).

physician say, converts the recorded speech into text, and as described above, applies an artificial intelligence model to generate and structure clinical documentation.

46. Because the Abridge tool is designed to capture the entire conversation rather than selected details a clinician chooses to record, the recordings and resulting transcripts necessarily contain the same sensitive material a patient would say out loud in the room—for example, symptoms, diagnoses, medication history, family history, mental health disclosures, and anything else discussed.

47. Upon information and belief, the recorded communications are transmitted outside the clinical environment and retained, stored, and otherwise processed on infrastructure associated with the Abridge platform. Upon information and belief, they are also accessed and used for purposes beyond generating the note, including system maintenance, troubleshooting, quality assurance, and AI model improvement. As a result, the contents of confidential physician–patient communications are transmitted beyond the immediate clinical encounter and handled by systems and personnel outside Defendants' healthcare facilities.

48. The platform deployed at Dayton Children's does not discard the underlying audio and transcript once a note is generated. Abridge's "Linked Evidence" feature, which is promoted in Dayton Children's publications about Abridge, allows the AI-generated note to be traced back to the source transcript and audio of the patient's visit.[16]

49. Because the Abridge system captures and processes the substance of oral communications during the medical encounter itself, the technology intercepts the contents of

[16] Dayton Children's, *Dayton Children's partners with Abridge to enhance care conversations*, (Sep. 26, 2025), https://childrensdayton.org/news-category/research-innovation/ (last visited Nov. 19, 2026).

those communications within the meaning of federal and Ohio privacy laws governing the interception and disclosure of confidential communications.

50. In doing so, the Abridge system sends outside the exam room the very conversations that medicine has always kept inside it. The duty of confidentiality between physician and patient is among the oldest and most widely understood obligations in professional life. It is embodied in the Hippocratic Oath, in the American Medical Association's Code of Medical Ethics, in Ohio's physician–patient privilege, Ohio Rev. Code Ann. § 2317.02(B)(1), and in the Health Insurance Portability and Accountability Act ("HIPAA"), and the common law. Patients do not need to read a contract to know that what they tell a doctor stays with the doctor, and they speak openly in the exam room because of it.

51. Defendants did not build a consent process that would tell parents, guardians, or patients what the system does. Defendants had clear business reasons to adopt this technology quickly, such as lightening clinicians' note-writing burden and tightening up billing documentation. These benefits came without a matching investment in lawful consent infrastructure, authorization protocols, or adequate safeguards necessary to protect patients' confidential information.

## C. DEFENDANTS' DEPLOYMENT ENABLES ABRIDGE AI, INC.'S ACCUMULATION OF VALUABLE, SENSITIVE PATIENT DATA FOR ABRIDGE AI, INC.'S OWN COMMERCIAL BENEFIT

52. Upon information and belief, this interception and processing of patient-doctor encounters is allowing Abridge AI, Inc. to amass a valuable, proprietary data asset of millions of highly sensitive medical conversation traces that are being used to train its AI technology and create a competitive moat.

53. This is not merely a theoretical allegation about the value of patient data—it is

confirmed by Abridge AI, Inc.'s own financial history and by independent financial press coverage of the company. In June 2025, Abridge AI, Inc. closed a $300 million Series E financing round that valued the company at approximately $5.3 billion, nearly double the $2.75 billion valuation it had received only four months earlier, in February 2025.[17] Trade press coverage of the round reported that Abridge AI, Inc.'s technology "leverag[es] a proprietary data set derived from more than 1.5 million medical encounters" processed through its ambient AI platform.[18]

54. The scale and speed of this valuation growth (doubling in approximately four months) is itself evidence of the substantial commercial value that sophisticated investors placed on Abridge AI, Inc.'s accumulating store of patient-doctor conversations, separate and apart from the modest per-seat software fees Abridge AI, Inc. charges individual health systems like Defendants for documentation services. Investors do not commit hundreds of millions of dollars, and assign multi-billion-dollar valuations, to a company principally on the strength of a note-taking convenience feature; upon information and belief, a substantial portion of that valuation reflects the durability, scale, and proprietary nature of the underlying corpus of confidential medical conversations Abridge AI, Inc. has amassed—a corpus built encounter by encounter, including from the confidential medical visits of Plaintiffs and Class Members at Defendants' facilities, without their knowledge or consent.

55. Peer-reviewed research explains why investors would place such value on that corpus: recordings of real patient-doctor conversations are both uniquely important to the

---

[17] Marina Temkin, *In Just 4 Months, AI Medical Scribe Abridge Doubles Valuation to $5.3B*, TechCrunch (June 24, 2025), https://techcrunch.com/2025/06/24/in-just-4-months-ai-medical-scribe-abridge-doubles-valuation-to-5-3b/ (last visited Nov. 19, 2026).

[18] Heather Landi, *Generative AI Company Abridge Scores $300M Series E Backed by a16z and Khosla Ventures*, Fierce Healthcare (June 24, 2025), https://www.fiercehealthcare.com/ai-and-machine-learning/ambient-ai-startup-abridge-scores-300m-series-e-backed-a16z-and-khosla (last visited Nov. 19, 2026).

development of medical AI and exceptionally difficult to obtain. In a 2025 study, Google researchers described their development of "AMIE," a large language model system designed to conduct diagnostic conversations with patients. The researchers emphasized that the physician-patient dialogue lies at the heart of medicine, noting that in some settings 60 to 80 percent of diagnoses are made through clinical history-taking alone. To train AMIE, Google did not rely solely on publicly available data. It licensed a de-identified dataset from a dialogue research organization consisting of 98,919 transcripts of in-person clinical visits, recorded from more than 1,000 U.S. clinicians over a ten-year period and spanning 51 medical specialties.[19]

56. Even that corpus, accumulated over a decade, proved insufficient. The researchers reported that available real-world dialogue data failed to capture the full range of medical conditions and clinical scenarios, forcing them to supplement it with AI-generated simulated conversations.[20] Abridge AI, Inc. faces no such constraint. By its own account, Abridge is live at more than 300 health systems that collectively serve more than 250 million patients, and its platform supports more than 100 million clinical conversations every year[21]—double the 50 million conversations the company projected supporting just one year earlier.[22] At that rate, the Abridge platform captures more real patient-doctor conversations in a single day than the entire decade-long dataset Google licensed to build AMIE.

---

[19] Tao Tu et al., *Towards Conversational Diagnostic Artificial Intelligence*, 642 Nature 442, 442 & Methods, Real-World Dialogue (2025), https://www.nature.com/articles/s41586-025-08866-7 (last visited Nov. 19, 2026).

[20] *Id.*

[21] Press Release, Abridge AI, Inc., *Abridge Unveils Patient-Centered Clinician Intelligence Platform Connecting Care Delivery, Payment, and Evidence-Based Treatment* (June 11, 2026), https://www.abridge.com/press-release/patient-centered-clinician-intelligence-platform-keynote (hereinafter "Abridge Press Release") (last visited Oct. 14, 2026).

[22] Landi, *supra* note 18.

57. Each patient encounter recorded through Defendants' Abridge deployment, including each of the encounters described in this Complaint, contributed incrementally to the very data asset driving Abridge AI, Inc.'s multibillion-dollar growth. Plaintiffs and Class Members received no share of that value, were not informed that their confidential medical communications were contributing to it and did not give informed consent to that use of their data.

58. This corpus of confidential medical conversations has an established market value independent of Abridge AI, Inc.'s own valuation. A useful marker for the value of patient data comes from the cybersecurity world. Published cybersecurity industry sources confirm that a complete patient medical record—the kind of rich, durable personal and health information contained in a full clinical encounter transcript—commands a substantial premium on illicit data markets compared to other categories of stolen personal information. Credit reporting agency Experian has reported that stolen medical records sell for as much as $1,000 each on the dark web, and cybersecurity firm Trustwave has separately valued stolen medical records at up to $250 each—figures that dwarf the approximately $5 black-market value of a stolen credit card number and the roughly $1 value of a stolen Social Security number.[23] This premium exists because a medical record, unlike a financial credential that can be canceled and reissued, contains detailed, durable personal information that does not expire: a patient's diagnoses, history, and personal circumstances remain true, and therefore useful to a buyer, for years or even a lifetime. The analogy to AI training holds because that same durability is what makes a clinical conversation valuable as training data. Once a conversation has been used to train an AI model, the information

[23] Paul Nadrag, *Industry Voices—Forget Credit Card Numbers. Medical Records Are the Hottest Items on the Dark Web*, Fierce Healthcare (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited Nov. 19, 2026) (citing Experian and Trustwave Global Security Report data).

extracted from it is embedded in the model and continues to generate value for the model's owner indefinitely; like the medical record and unlike the credit card, it cannot be canceled, reissued, or recalled. Each of Plaintiffs' and Class Members' recorded encounters, captured and transmitted through Defendants' Abridge deployment, falls squarely within this valuable category of data.

59. A lawful commercial market for AI training data exists, and it confirms that recorded conversations command substantial prices. One speech-data vendor reports that off-the-shelf datasets of ordinary conversational speech sell for $35 to $95 per hour of conversational audio and prices custom recordings separately by project.[24] Companies also pay individuals directly to record their own conversations for AI training. One widely used consumer app pays users as much as 30 cents per minute to record their phone calls, up to $30 per day, and sells the recordings to AI companies "for the purpose of developing, training, testing, and improving machine learning models."[25] Recorded clinical dialogue is licensed in this market too: as alleged above, Google licensed a dataset of 98,919 clinical-visit transcripts to train AMIE.

60. Recorded clinical conversations are far scarcer than ordinary speech, because they cannot lawfully be collected at scale without patients' consent. They are also richer, because they capture symptoms, diagnoses, and treatment decisions that ordinary speech does not. Upon information and belief, the market value of clinical conversations therefore substantially exceeds these rates. Plaintiffs and Class Members received none of that value.

---

[24] Andreas Kromann Bjærg, *How to Buy Speech Data: The Complete Buyer's Guide*, SpeechData.ai (June 18, 2026, updated Oct. 17, 2026), https://www.speechdata.ai/guides/how-to-buy-speech-data (last visited Nov. 19, 2026).

[25] Sarah Perez, *Neon, the No. 2 Social App on the Apple App Store, Pays Users to Record Their Phone Calls and Sells Data to AI Firms*, TechCrunch (Sep. 24, 2025), https://techcrunch.com/2025/09/24/neon-the-no-2-social-app-on-the-apple-app-store-pays-users-to-record-their-phone-calls-and-sells-data-to-ai-firms/ (last visited Nov. 19, 2026).

61. Abridge AI, Inc. understands the value of that advantage. Its CEO, Shiv Rao, has publicly stated that AI models such as Abridge's must be trained, shaped, and evaluated against real-world conditions to work in practice, explaining the company's rationale for training on actual clinical data.[26]

62. Abridge AI, Inc. is now acting on that rationale at an unprecedented scale. On June 11, 2026, Abridge announced that it is working with Nvidia to build a foundation model purpose-built for clinical conversations. According to Abridge, the model is built on the Nvidia Nemotron open model family and will be trained on de-identified data at every stage of training (pre-, mid-, and post-training) so that clinical knowledge is embedded in the model from its foundation. Upon information and belief, that de-identified data is drawn from the patient encounters processed through the Abridge platform. Nvidia's Vice President of Healthcare confirmed the direct connection between Abridge's customer deployments and the capabilities of its models, stating that "every deployment makes [Abridge's] clinical intelligence smarter and more capable."[27]

63. Despite that value, upon information and belief, the enterprise agreement and Business Associate Agreement governing Defendants' deployment of the Abridge platform do not limit or exclude Defendants' patients' encounters from use in Abridge AI, Inc.'s broader data-driven product development and model training practices, including the practices described in Abridge AI, Inc.'s public statements and press materials described above. Upon information and belief, Defendants failed to disclose the existence or substance of any such data-use provisions to

---

[26] *Nvidia Taps Abridge to Train AI on Real Doctor Visits*, PYMNTS.COM (June 11, 2026), https://www.pymnts.com/news/artificial-intelligence/2026/nvidia-taps-abridge-to-train-ai-on-real-doctor-visits/ (last visited Nov. 19, 2026); *see also* Belle Lin, *Nvidia Is Developing an AI Healthcare Model With Startup Abridge*, Wall St. J. (June 11, 2026), https://www.wsj.com/cio-journal/nvidia-is-developing-an-ai-healthcare-model-with-startup-abridge-6db38c1b (last visited Nov. 19, 2026).

[27] Abridge Press Release, *supra* note 21.

Plaintiffs and Class Members and, upon information and belief, failed to negotiate any limitation on Abridge AI, Inc.'s use of Plaintiffs' and Class Members' medical conversations before deploying the Abridge system across their facilities.

64. Upon information and belief, Defendants were aware, before and during their deployment of the Abridge system, of Abridge AI, Inc.'s publicly stated practice of using clinical conversation data captured through its platform to train, refine, and improve its own artificial-intelligence models and commercial products. As a sophisticated, integrated healthcare system that negotiated and executed an enterprise-wide agreement with Abridge AI, Inc., Defendants had both the opportunity and the obligation to review Abridge AI, Inc.'s publicly disclosed data-use practices and to negotiate contractual limitations excluding Defendants' patients' encounters from those practices before agreeing to route their patients' confidential medical conversations through Abridge AI, Inc.'s systems. Upon information and belief, Defendants negotiated no such limitation. Instead, they activated the Abridge system knowing that doing so would expose their patients' intercepted communications to a use (commercial AI model training for a third party's independent benefit) that Defendants had neither disclosed to, nor obtained consent from, Plaintiffs or Class Members to permit.

65. Accordingly, because Abridge AI, Inc.'s stated purpose for using de-identified data is not confined to any individual patient's clinical documentation, but by its own account extends to refining its algorithms and improving its products generally, any consent obtained from Plaintiffs or Class Members for the limited purpose of generating a clinical note did not, and could not, extend to Abridge AI, Inc.'s further use of data drawn from Plaintiffs' and Class Members' confidential medical communications to develop and improve its commercial artificial-intelligence products.

66. The harm from that undisclosed use cannot be undone. Upon information and belief, neither Defendants nor Abridge AI, Inc. has implemented a mechanism by which a patient or their parent or guardian's request to delete their recording or transcript also reaches any de-identified data or model-training output already derived from that patient's encounter before the request was made. As a result, a request to have the child's encounter removed from Defendants' systems does not undo Abridge AI, Inc.'s prior use of data drawn from that encounter to train or refine its models.

67. The de-identification protections Abridge AI, Inc. claims to apply to that data are themselves inadequate to the risk. The U.S. Department of Health and Human Services itself acknowledges that data de-identified under HIPAA's Safe Harbor standard remains vulnerable to re-identification.[28] That risk is compounded in the context of clinical large language models. Recent research using simulated patient records found that de-identifying each disclosure separately does not account for cumulative re-identification risk: when the same patient's information is discussed across multiple related disclosures, each successive disclosure reveals additional quasi-identifiers that progressively narrow the set of individuals to whom a given record could belong. [29]

68. HIPAA's "Safe Harbor" method, 45 C.F.R. § 164.514(b)(2), treats health information as "de-identified" once eighteen specific identifiers have been removed, such as

[28] *See* U.S. Dep't of Health & Human Servs., Office for Civil Rights, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited Nov. 19, 2026) (acknowledging that data de-identified under either the Safe Harbor or Expert Determination methodology "retains some risk of identification").

[29] James Weatherhead et al., *K-Anonymity Decay in Multi-Turn Clinical Large Language Model Conversations*, 8 Frontiers Digit. Health, art. 1832168 (2026), https://doi.org/10.3389/fdgth.2026.1832168 (last visited Nov. 19, 2026).

names, street addresses, all elements of dates (other than the year) related to the individual, and Social Security numbers. But as researchers at New York University have explained, that rule was designed for simple, spreadsheet-style records, not the free-form conversations and notes that doctors and patients actually produce. Removing a patient's name and address does not remove everything else in the record. The diagnosis, the medications, the details of the patient's life remain, and those remaining details, taken together, can still point to a particular person. Modern AI language models, like the one Abridge uses, are especially good at finding and exploiting those connections. Working with de-identified notes from more than 170,000 patients, the NYU researchers showed that an AI model could guess a patient's neighborhood better than chance from the diagnosis alone. Even after the notes had been scrubbed under HIPAA's Safe Harbor rule, the model's ability to trace them back to the patients they described was approximately 37 times greater than the strongest baseline guessing strategy.[30]

69. Making matters worse, LLMs and generative AI technology have been the subject of privacy controversies concerning the vulnerability of their training data. Researchers have demonstrated that LLMs can memorize portions of their training data and later reproduce that information in response to carefully designed queries.[31] In 2021, researchers demonstrated the extraction of hundreds of verbatim training examples from OpenAI's GPT-2, including names, telephone numbers, email addresses, conversations, and other unique information.[32] Subsequent

---

[30] Lavender Y. Jiang et al., *Paradox of De-identification: A Critique of HIPAA Safe Harbour in the Age of LLMs*, abstract, §§ 3, 4.1-4.2 & tbl. 1 (Feb. 9, 2026), https://arxiv.org/pdf/2602.08997 (last visited Oct. 14, 2026).

[31] *See, e.g.*, Nicholas Carlini et al., *Quantifying Memorization Across Neural Language Models*, *in Proceedings of the Eleventh International Conference on Learning Representations* (2023), https://arxiv.org/pdf/2202.07646 (last visited Oct. 14, 2026).

[32] Nicholas Carlini et al., *Extracting Training Data from Large Language Models*, *in Proceedings of the 30th USENIX Security Symposium* 2633 (2021), https://www.usenix.org/system/files/sec21-carlini-extracting.pdf (last visited Nov. 19, 2026).

research demonstrated the problem at considerably greater scale. In 2023, researchers reported extracting gigabytes of training data from several model families and demonstrated an extraction attack against ChatGPT that caused the model to emit memorized training information at substantially elevated rates.[33] These studies demonstrate that information incorporated into model training cannot be assumed to remain incapable of later reproduction.

70. For these reasons, the accumulation and use of sensitive patient data for a purpose extending beyond any individual patient's own care is a significant invasion of privacy and a security risk, and one that Defendants are directly facilitating through their deployment of the Abridge system without adequate safeguards or contractual limitations on Abridge AI, Inc.'s downstream use of the data.

71. Defendants are not merely licensing a documentation tool. Each recording captured through the Abridge system adds to a proprietary corpus of confidential patient-doctor communications that Abridge AI, Inc. is using for its own commercial benefit—training and refining its models, improving its products, and building a durable competitive advantage in an increasingly crowded ambient-AI market. That corpus carries a substantial monetary value, and Plaintiffs and Class Members, whose confidential conversations built it, have been given no share of that value.

## D. THE CONSENT GAP

72. Upon information and belief, Defendants deployed the Abridge system with, at most, a perfunctory notice protocol (the "Notice Protocol"), designed at the enterprise level to minimize disruption to clinical workflow and maximize utilization of the tool, rather than to inform

[33] Milad Nasr et al., *Scalable Extraction of Training Data from (Production) Language Models*, arXiv:2311.17035 (Nov. 28, 2023), https://arxiv.org/pdf/2311.17035 (last visited Nov. 19, 2026).

patients or obtain their meaningful agreement. To the extent Defendants adopted no enterprise-level notice processes at all, the "Notice Protocol" refers to that absence, and each allegation below applies with even greater force.

73. Any AI disclosure Defendants provided was framed as a disclosure about Defendants' own tools and the patient's own care. Upon information and belief, the Notice Protocol described the AI, at most, as something the clinician would use to help document the visit. It did not identify Abridge AI, Inc. by name, did not disclose that the tool belonged to or was operated by an outside company, and did not disclose that the conversation would leave Defendants' systems. Parents, guardians, and patients therefore had no reason to understand that a third party was being added to their conversation.

74. Consent is limited to its scope. A patient's agreement to their provider's use of a documentation aid within the physician-patient relationship is not an agreement to the disclosure of their conversation to a separate company, still less to that company's retention and use of the conversation for its own commercial purposes. So too, with a parent's agreement to their child's provider's use of a documentation aid.

75. The Notice Protocol was designed, approved, and implemented by Defendants centrally, and applied in materially the same manner to every patient and to every family member, caregiver, or other companion accompanying a patient. Its brevity was a design choice, not an oversight. Upon information and belief, Defendants structured the Notice Protocol so that it would add no meaningful time to the visit and would rarely, if ever, result in a patient declining its use.

76. Defendants know how to obtain informed consent before sharing patients' information with third parties, and do so routinely in other contexts. HIPAA itself requires a covered entity to obtain a patient's written authorization, identifying the information to be used or

disclosed, who will receive it, and for what purpose, before using or disclosing PHI for purposes the Privacy Rule does not otherwise permit. 45 C.F.R. § 164.508(a)(1), (c)(1). Defendants chose not to apply any comparable process to the Abridge system, even though that system captures the entirety of the private conversation between patient and clinician (and oftentimes, parent) and transmits it to a third party.

77. The Notice Protocol omitted numerous disclosures that were material to a patient's decision whether to permit the recording. Upon information and belief, it did not, at any point:

a. disclose that the entire conversation would be recorded as audio, as opposed to merely summarized or listened to;

b. disclose that the audio would be transmitted and processed on the servers of a third party, Abridge AI, Inc.;

c. disclose that recordings, transcripts, or data derived from them could be retained by Abridge AI, Inc. or used for purposes beyond the patient's own clinical note, including training and improving Abridge AI, Inc.'s artificial-intelligence models and commercial products;

d. disclose how long recordings and transcripts would be retained, or how they could be deleted;

e. provide notice before the day of the visit, whether by mail, patient-portal message, intake paperwork, or otherwise, so that patients could make an informed decision outside the exam room;

f. seek the agreement of every person participating in the conversation, including each family member, caregiver, or other companion present, as opposed to, at most, the patient alone;

g. provide any visible or audible indication in the exam room that the recording was active; or

h. provide a means of withdrawing consent that resulted in actual deletion of the recording and transcript, as opposed to their removal from the visible chart note.

78. Because the Notice Protocol was the most Plaintiffs or any Class Member were told, it defines the outer boundary of any consent Defendants can claim. Upon information and

belief, clinicians were neither trained nor instructed to provide any of the disclosures identified in the paragraph above, and did not do so. To the extent any clinician departed from the Notice Protocol, the departure consisted of omitting steps (such as activating the recording with no notice at all), not of supplying the missing disclosures. Neither Plaintiffs nor any Class Member therefore received more information than the Notice Protocol provided, and the legal sufficiency of Plaintiffs' or any Class Member's purported consent can be determined by examining the Notice Protocol itself.

79. Upon information and belief, Defendants never informed their clinicians of the data-use terms of their agreements with Abridge AI, Inc. and never trained them to disclose those terms. A clinician who spent ten minutes explaining the Abridge tool to a patient or parent could not have disclosed what Defendants never told the clinician.

80. Upon information and belief, Defendants implemented no audit, spot-check, or compliance-monitoring process to verify that clinicians followed even the Notice Protocol. As a result, upon information and belief, the only documentation of consent in Defendants' possession, if any exists, is a templated attestation or electronic health record entry that is substantively identical across encounters and records, neither what was actually said nor which participants, if any, agreed. Any such record serves only to document consent for Defendants' benefit, regardless of what, if anything, was communicated to the patient or parent in the exam room.

81. The Notice Protocol was deficient as to every Class Member, for reasons that do not vary from encounter to encounter:

a. *No all-party consent to recording and transmission.* Upon information and belief, the Notice Protocol did not provide for (i) obtaining the agreement of every person participating in the conversation; or (ii) disclosing that the entire conversation would be recorded and transmitted to an outside company. Nor did Defendants train or instruct their clinicians to disclose that transmission.

b. *Consent does not extend to undisclosed purposes.* Upon information and belief, the Notice Protocol did not disclose that the full conversation would be transmitted to a third party so that the third party could retain the conversation traces and use them to develop its own commercial products. Whatever agreement a patient may have given under the Notice Protocol therefore did not extend to those undisclosed uses.

82. Because each deficiency identified above is built into the design of the Notice Protocol, rather than resulting from how any individual clinician applied it, whether Plaintiffs or any Class Member gave legally effective consent is a question common to the Class. It can be answered through common proof, including the Notice Protocol's scripts and templates, Defendants' policies and training materials, Defendants' electronic health record configuration, and Defendants' agreements with Abridge AI, Inc., without individualized inquiry into what was said in any particular exam room. To the extent any further question remains as to whether any disclosure was made at the start of a particular encounter, it can be answered by applying a single, objective method to the recordings and transcripts in Defendants' and Abridge AI, Inc.'s possession, each of which begins when the clinician activates the Abridge tool, without testimony from any Class Member.

## E. THIS WAS NOT AN ISOLATED INCIDENT

83. Plaintiffs' experiences reflect how Defendants ran this program system-wide, not a one-off lapse involving a single clinician.

84. Upon information and belief, Defendants deployed Abridge no later than May 2025.[34] At that time, already 25% of Dayton Children's providers were utilizing Abridge.[35] By

[34] WHIOTV7, *supra* note 1.

[35] *Id.*

August 2025, Dayton Children's clinic-by-clinic rollout forecasted that 200 providers within the hospital system would soon be on board.[36]

85. Since Dayton Children's roll-out of the Abridge technology across its health system, a meaningful share of patient encounters has been captured through the platform. In 2025, Defendants recorded 853,556 total outpatient visits and 7,096 hospital admissions across their healthcare system.[37]

86. As a result, the harm Plaintiffs experienced—an unconsented recording of a private medical conversation, routed to a vendor outside Defendants' walls for that vendor's own benefit—was not unique to Plaintiffs' visits but was, upon information and belief, the predictable outcome of how Defendants configured and rolled out the system across their patient population.

**F. PLAINTIFFS' AND CLASS MEMBERS' INJURIES**

87. Defendants' conduct has injured Plaintiffs and Class Members in ways that are concrete and already complete. Plaintiffs' and Class Members' confidential medical communications have already been intercepted, transmitted, and—upon information and belief—incorporated into Abridge AI, Inc.'s existing training corpus under de-identification methods that independent research shows do not reliably prevent re-identification of clinical text.

88. Each recording invaded Plaintiffs' interest in privacy and confidentiality the moment it was made and sent to Abridge AI, Inc.; it deprived them of the confidential care they paid for and of control over valuable information about their own health; and it enriched

---

[36] Alese Underwood, *AI technology changing the game for pediatric care*, Spectrum News (Aug. 27, 2025), https://spectrumlocalnews.com/product-pages/nyc/news/2025/08/26/ai-technology-changing-the-game-for-pediatric-care- (last visited Nov. 19, 2026).

[37] Dayton Children's, *annual report 2025,* https://childrensdayton.org/wp-content/uploads/2026/01/2025-annual-report-dayton-childrens.pdf (last visited Nov. 19, 2026).

Defendants at their expense. Because Defendants continue to record patient visits under the same process, those injuries are also ongoing.

89. *The invasion itself.* Each recording was a completed invasion of Plaintiffs' and Class Members' privacy. Their private conversations with the children's providers, which the law treats among the most protected communications there are, were captured in full and transmitted to a third party without their consent. That injury was complete the moment the recording was made and sent, and it does not depend on anything Abridge AI, Inc. did afterward.

90. *Interference with a confidential relationship.* The unauthorized disclosure of nonpublic medical information causes an injury when the disclosure occurs because medical information is inherently private and because the public has a clearly established interest in protecting the relationships between doctors and patients.

91. *Emotional distress*. Plaintiffs and Class Members have suffered emotional distress, anxiety, and humiliation from learning that conversations about their and/or their child's bodies, health, and most personal concerns were recorded and sent to a technology company without their knowledge.

92. *Loss of candor in ongoing care.* The harm extends beyond the past. Effective medical care depends on pediatric patients and their caregivers speaking openly with a child's providers. Plaintiffs and Class Members now approach appointments knowing that anything said may be recorded and transmitted.

93. *Lost benefit of bargain.* Plaintiffs and Class Members paid for medical services on the understanding, inherent in the physician-patient relationship, that what they and their children said in the exam room would be used for their child's care and kept confidential. Confidentiality was part of what they paid for. Because Defendants recorded their conversations and transmitted

them to a third party without informed consent, they received services worth less than what they paid.

94. *Lost opportunity to control and license health information.* Recorded clinical conversations are valuable AI training data, and individuals are paid to supply their own conversations for that purpose. *See* Section C, *supra*. Had Abridge AI, Inc. not obtained Plaintiffs' and Class Members' conversations through Defendants without consent, it would have had to acquire comparable data some other way, including by licensing it or paying the people whose conversations it used. Upon information and belief, by taking the conversations without consent, Defendants and Abridge AI, Inc. deprived Plaintiffs and Class Members of the opportunity to decide whether, and on what terms, to allow that use, and of the value that decision carries.

95. *Defendants' gain.* Defendants obtained the benefits of the Abridge deployment at Plaintiffs' and Class Members' expense: reduced clinician documentation time, more patient visits per clinician, and more fully captured billing. Upon information and belief, Defendants also paid less for the platform than they otherwise would have, because Abridge AI, Inc.'s pricing reflected the value of the patient conversation it received.

96. *Continuing threat of future recording.* Plaintiffs and Class Members will continue to receive care from Defendants. Defendants continue to use the Abridge platform under the same Notice Protocol. Absent injunctive relief, they will be subjected to the same practice again.

## G. DEFENDANTS' USE OF THE AMBIENT AI RECORDING TOOL VIOLATES BOTH HIPAA AND THE OHIO REVISED CODE

97. Defendants' disclosure of Plaintiffs' and Class Members' private information to Abridge contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually

Identifiable Health Information" (also known as the "Privacy Rule"), which governs how health care providers must safeguard and protect patients' health information.[38]

98. Defendants are "covered entities" under HIPAA and its implementing regulations. 45 C.F.R. § 160.103. The recordings and transcripts of Plaintiffs' and Class Members' medical visits are individually identifiable health information and protected health information ("PHI"): they were created by a health care provider, relate to the patient's health and health care, and identify the patient. *Id.* Abridge AI, Inc. received that PHI as Defendants' "business associate." *Id.*

99. HIPAA permits a covered entity to disclose PHI to a business associate without patient authorization only so that the business associate can perform functions on the covered entity's behalf, and only under a business associate agreement that limits the business associate's use of the PHI to those functions. 45 C.F.R. §§ 164.502(a)(3), 164.502(e), 164.504(e)(2). A business associate agreement may not authorize any use that would violate the Privacy Rule if done by the covered entity itself. 45 C.F.R. § 164.504(e)(2)(i).

100. Using PHI to develop, train, or improve a vendor's own commercial products is not a function performed on the covered entity's behalf; it requires the individual's written authorization. 45 C.F.R. § 164.508(a)(1). De-identifying PHI is itself a use of PHI, which a business associate may undertake only if its agreement permits it. 45 C.F.R. §§ 164.502(a)(3), (d)(1), 164.504(e)(2)(i). And de-identification under HIPAA's Safe Harbor method is unavailable where the entity has actual knowledge that the remaining information could identify the individual. 45 C.F.R. § 164.514(b)(2)(ii). Upon information and belief, the free-text transcripts of clinical visits, which routinely include names, dates, family members, employers, and locations spoken

---

[38] U.S. Dep't of Health & Human Servs., *The HIPAA Privacy Rule* (last reviewed Nov. 19, 2026), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Nov. 19, 2026).

aloud, cannot reliably be de-identified by the automated methods Abridge AI, Inc. uses. *See* Section C, *supra*.

101. The HIPAA Privacy Rule further requires any “covered entity”—which includes Defendants—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

102. In contravention of HIPAA, Defendants failed to “review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[,]” 45 C.F.R. § 164.306(e), and to “[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights.” 45 C.F.R. § 164.312(a)(1).

103. Upon information and belief, Defendants failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. Failing to effectively train their workforces (including independent contractors) on the policies and procedures for PHI in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

d. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

104. Upon information and belief, Defendants further violated the Privacy Rule by: (a) disclosing Plaintiffs' and Class Members' PHI to Abridge AI, Inc. under a business associate agreement that failed to prohibit, or affirmatively permitted, Abridge AI, Inc.'s use of that PHI, including through de-identification, to train and improve its own models and products, 45 C.F.R. §§ 164.502(e), 164.504(e)(2); (b) permitting that use without Plaintiffs' and Class Members' written authorization, 45 C.F.R. § 164.508(a)(1); and (c) despite knowing of Abridge AI, Inc.'s publicly stated data-use practices, failing to take reasonable steps to end that use or terminate the arrangement, 45 C.F.R. § 164.504(e)(1)(ii).

105. Because Defendants made those disclosures knowingly, with awareness of Abridge AI, Inc.'s data-use practices and of the terms of their own agreements, they fall within 42 U.S.C. § 1320d-6, which makes it a federal crime to knowingly disclose individually identifiable health information in violation of HIPAA.

106. Plaintiffs do not assert a private right of action under HIPAA. Defendants' HIPAA violations are alleged because they establish, among other things, (a) the criminal and tortious purpose that defeats consent exceptions under the Federal Wiretap Act (Count I) and the Ohio Wiretap Act (Count II); (b) the confidentiality owed to patients within the doctor-patient and hospital-patient relationships (Count III); and (c) the standard of care a reasonable health system exercises in disclosing patient information to a business associate (Count V).

107. Ohio statutory law expressly incorporates HIPAA and its regulations. Ohio Rev. Code §§ 3798.01, *et seq.* Defendants' conduct violating HIPAA also violated the Ohio Revised Code.

## TOLLING AND ESTOPPEL

108. Any applicable statutes of limitation have been tolled by operation of the discovery rule and by Defendants' failure to disclose their use of Abridge despite their duty to do so, as alleged below.

109. Abridge is inconspicuous. A reasonable person without prior knowledge of Abridge would not understand the function or scope of information collected by Abridge.

110. Defendants were under a duty, arising from the confidential nature of the physician–patient relationship, to disclose the nature, significance, and consequences of their use of ambient AI clinical documentation tools, like Abridge. Despite this obligation, Defendants failed to provide adequate notice of Defendants' use of the Abridge system during patient-doctor visits, and Plaintiffs and Class Members had no reason to suspect, and no practical means of discovering, that their confidential medical conversations were being intercepted, transmitted, and processed by a third-party technology vendor.

111. Therefore, through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' unlawful conduct. As such, Plaintiffs could not have known the information essential to pursue their claims.

112. For these reasons, all applicable statutes of limitation have been tolled pursuant to the discovery rule.

113. Plaintiffs and Class Members, acting with reasonable diligence, could not have discovered Defendants' misconduct before learning that their conversations had been transmitted to, and could be retained and used by, Abridge AI, Inc.

## CLASS ACTION ALLEGATIONS

114. This action is brought pursuant to Federal Rule of Civil Procedure 23 by the named

Plaintiff on her own behalf, as a parent and next friend of her Minor Children, and on behalf of a proposed Class of all other persons similarly situated.

115. Specifically, Plaintiffs propose the following Class, subject to amendment as appropriate:

> All individuals whose health information and/or communications were recorded by or disclosed to Abridge or a comparable ambient AI documentation tool during the relevant class period.

116. The relevant class period is the longest permitted by law.

117. Excluded from the Class are: (a) Defendants, their parents, subsidiaries, and affiliates, any entity in which they have a controlling interest, and their officers and directors; (b) Defendants' employees, agents, and affiliated providers, and any interpreter or other person who participated in a recorded conversation on Defendants' behalf; and (c) the Judge to whom this case is assigned and the Judge's staff.

118. Plaintiffs reserve the right to amend the definition of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

119. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Defendants announced in August 2025 that they would expand the program to more than 200 clinicians across their health system.[39] Defendants reported 853,556 outpatient visits, 7,096 hospital admissions, 18,019 psychology visits, and 17,719 psychiatry visits in 2025 alone.[40] Given that volume, and Defendants' system-wide deployment of Abridge during the same period, Plaintiffs allege, upon information and belief, that Defendants' records reflect many

[39] Underwood, *supra* note 37.

[40] Dayton Children's, *2025 annual report*, *supra* note 38.

thousands of medical visits meeting the Class definition. The exact number of Class Members is uniquely within Defendants' knowledge and is readily ascertainable from Defendants' own electronic health records, scheduling systems, and system logs identifying which patient encounters were processed through the Abridge platform.

120. **Commonality.** Questions of law and fact common to the Class exist, because Plaintiffs' and Class Members' claims all arise from the same deployment of the same technology under the same Notice Protocol. These common questions include, but are not limited to:

a. Whether conversations between pediatric patients, their parents and guardians, and providers in Defendants' exam rooms are oral communications within the meaning of 18 U.S.C. § 2510(2) and Ohio Rev. Code Ann. § 2933.51(B);

b. Whether Defendants' use of the Abridge platform recorded, intercepted, and transmitted those conversations;

c. Whether the Notice Protocol sought or obtained the consent of all parties to each recorded conversation;

d. Whether the Notice Protocol disclosed that recorded conversations would be transmitted to Abridge AI, Inc., or that Abridge AI, Inc. could retain or use them for its own purposes;

e. Whether Defendants informed their clinicians of the data-use terms of their agreements with Abridge AI, Inc.;

f. Whether, and on what terms, Defendants' agreements with Abridge AI, Inc. permitted Abridge AI, Inc. to retain or use patient conversations, directly or through de-identification, to develop its own products;

g. Whether Defendants' interception was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), or a criminal offense, tortious act, or other injurious act within the meaning of Ohio Rev. Code Ann. § 2933.52(B)(4);

h. Whether Defendants breached their duty of confidentiality by disclosing information obtained in the course of the physician-patient relationship without authorization;

i. Whether Defendants' conduct constitutes an intrusion upon seclusion that would be highly offensive to a reasonable person;

j. Whether Defendants owed and breached a duty of care in selecting, configuring, and deploying the Abridge platform;

k. Whether Defendants breached an implied promise of confidentiality, and whether Defendants were unjustly enriched by the recording and processing of Plaintiffs' and Class Members' conversations;

l. Whether the uniform omissions in the Notice Protocol prevented Class Members, as a class, from discovering their conversations were transmitted to, and could be retained and used by, Abridge AI, Inc., such that the discovery rule tolls the applicable limitations periods on a class-wide basis; and

m. Whether Plaintiffs and Class Members are entitled to damages, statutory damages, declaratory relief, and injunctive relief, and the measure of that relief.

121. **Typicality.** Plaintiff's claims, and the claims she asserts as next friend of her Minor Children, are typical of those of both categories of Class Members because they arise from the same course of conduct and rest on the same legal theories. The conversations at her children's visits were recorded under the same deployment, transmitted to the same vendor under the same agreements, and governed by the same centrally designed Notice Protocol that applied to every Class Member. That Plaintiff received no notice at all does not make her claims atypical. As alleged previously, the Notice Protocol defines the most any Class Member was told, and any departure from it consisted only of omitting steps, not supplying additional disclosures. Every Class Member therefore shares the deficiencies on which Plaintiff's claims rest: no disclosure that the conversation would be transmitted to Abridge AI, Inc., and no disclosure that Abridge AI, Inc. could retain or use patient conversations for its own purposes. Those deficiencies were common to every Class Member regardless of what any clinician said, because Defendants never informed

their clinicians of the data-use terms of their agreements with Abridge AI, Inc. and never instructed them to disclose those terms.

122. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that the infringement of the rights and damages Plaintiffs have suffered are typical of other Class Members. Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Indeed, the interests of parents and guardians and the Minor Class Members are aligned: both arise from the same recorded encounters, both seek to vindicate the same privacy and confidentiality interests, and relief for one category does not come at the expense of the other. As the parent of her own children, Plaintiff is motivated to protect the interests of the Minor Class Members as vigorously as her own. Plaintiff seeks no relief that is antagonistic to those of the other members of the Class. Plaintiff has also retained counsel experienced in complex class action litigation and Plaintiff intends to prosecute this action vigorously.

123. **Predominance.** Defendants engaged in a common course of conduct toward Plaintiffs and Class Members in that Plaintiffs and all Class Members had their confidential medical communications recorded, transmitted, and processed through the Abridge ambient AI documentation system pursuant to the same enterprise agreement with Abridge AI, Inc., the same electronic health record integration, and the same centrally designed Notice Protocol. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

124. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would, therefore, have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

125. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

126. Alternatively, certification of particular issues is appropriate under Federal Rule of Civil Procedure 23(c)(4), because resolving the following common questions on a class-wide basis would materially advance the disposition of this action:

a. Whether conversations between patients and providers in Defendants' exam rooms are oral communications within the meaning of 18 U.S.C. § 2510(2);

b. Whether the Notice Protocol sought or obtained the consent of all parties to each recorded conversation;

c. Whether the Notice Protocol disclosed that recorded conversations would be transmitted to Abridge AI, Inc., or that Abridge AI, Inc. could retain or use them for its own purposes;

d. Whether Defendants informed their clinicians of the data-use terms of their agreements with Abridge AI, Inc.;

e. Whether Defendants' interception was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d); and

f. Whether Defendants owed a duty of care in selecting, configuring, and deploying the Abridge platform, and whether they breached that duty.

127. Finally, all members of the proposed Class are readily ascertainable from records in Defendants' and/or Abridge's possession, including electronic health records, scheduling systems, and system logs identifying which patient encounters were processed through the Abridge platform.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2510 *et seq.*
### (*On behalf of Plaintiffs and the Class*)

128. Plaintiffs incorporate and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

129. The ECPA, otherwise known as the Federal Wiretap Act, prohibits intentionally intercepting the contents of an oral communication, disclosing those intercepted contents, and using them, without consent. 18 U.S.C. § 2511(1)(a), (c), (d).

130. When Defendants activated the Abridge tool during Plaintiffs' and Class Members' visits, they intentionally captured the substance of those confidential conversations in real time, constituting an interception within the meaning of 18 U.S.C. § 2510(4).

131. The microphone-enabled devices, software applications, and cloud-based infrastructure that Defendants and Abridge used to capture, transmit, and process the contents of Plaintiffs' and Class Members' oral communications constitute an "electronic, mechanical, or other device" within the meaning of 18 U.S.C. § 2510(5), because that infrastructure was used to intercept the contents of those communications and was not furnished to Defendants by a communications common carrier in the ordinary course of its business.

132. Defendants disclosed that intercepted material by transmitting it to Abridge AI, Inc.'s infrastructure for processing, and used it to generate clinical notes, and, on information and belief, to help train and refine Abridge AI, Inc.'s underlying AI system—all without the patients' informed consent.

133. Neither Plaintiffs nor the Class Members whom Plaintiff seeks to represent gave prior, informed consent to having their visits intercepted, disclosed, or used this way, and no court order authorized it.

134. The Federal Wiretap Act provides that a person who is a party to the communication, or who has obtained the prior consent of one party, is ordinarily exempt from liability. 18 U.S.C. § 2511(2)(d). That exemption does not apply, however, where the communication is intercepted for the purpose of committing any criminal or tortious act. *Id.* A covered entity's knowing disclosure of individually identifiable health information in violation of HIPAA and the breach of a state's medical-confidentiality duty, are criminal or tortious acts that defeat the exemption.

135. Plaintiffs and Class Members did not consent to the recording. The recording was not incidental to routine business operations, but instead, was undertaken for the tortious and unlawful purpose of disclosing and exploiting Plaintiffs' and Class Members' confidential medical communications for a vendor's independent commercial benefit, including the training and improvement of proprietary artificial-intelligence models, and in violation of HIPAA and Ohio's common-law duty of confidentiality. Consent obtained, if any, without disclosure of these downstream commercial uses does not constitute valid, informed consent, and the interception falls outside any exception to liability under 18 U.S.C. § 2511(2)(d).

136. Defendants' own decision to activate the Abridge tool (made with knowledge of Abridge AI, Inc.'s disclosed data-use practices and without negotiating any limitation on those practices, as alleged above) means the tortious and unlawful purpose motivating the interception is properly attributed to Defendants, and not merely to Abridge AI, Inc. as an independent downstream actor.

137. The unlawful disclosure of Plaintiffs' and Class Members' confidential medical information is an act independent of, and effectuated through, the act of recording: at the moment Defendants activated the Abridge tool, upon information and belief, they intended that the intercepted communications would be transmitted to Abridge AI, Inc. and used for its independent commercial benefit. That Defendants may also have had a documentation purpose does not sanitize an interception simultaneously undertaken for that unlawful purpose.

138. Under 18 U.S.C. § 2520, Plaintiffs and the Class are entitled to the greater of the sum of actual damages and any profits Defendants made as a result of the violation, or statutory damages of $100 per day per violation or $10,000, whichever is larger, plus reasonable attorneys' fees and litigation costs.

**<u>COUNT II</u>**
**VIOLATION OF THE OHIO WIRETAP ACT**
**Ohio Rev. Code § 2933.51, *et seq.***
**(*On behalf of Plaintiffs and the Class*)**

139. Plaintiffs incorporate and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

140. Ohio's wiretap statute, Ohio Rev. Code Ann. § 2933.51, *et seq.* (the "Ohio Wiretap Act"), provides that no person shall purposely (a) intercept, attempt to intercept, or procure another person to intercept or attempt to intercept an oral communication; (b) use, attempt to use, or procure another person to use or attempt to use an interception device to intercept an oral

communication, where the device is connected to, or transmits a signal through, a wire, cable, or similar connection, or transmits communications by radio; or (c) use or attempt to use the contents of an oral communication, knowing or having reason to know that the contents were obtained through an interception in violation of the Act. Ohio Rev. Code Ann. § 2933.52(A)(1)–(3).

141. The Ohio Wiretap Act authorizes any person whose oral communications are intercepted, disclosed, or intentionally used in violation of Ohio Rev. Code Ann. §§ 2933.51 to 2933.66 to bring a civil action against the person or entity that engaged in the violation. Ohio Rev. Code Ann. § 2933.65(A).

142. Each Defendant is a "person" within the meaning of Ohio Rev. Code Ann. § 2933.51(K), which incorporates the definition of "person" in Ohio Rev. Code Ann. § 1.59, including corporations.

143. The conversations among Plaintiffs, Class Members, and Defendants' clinicians during pediatric medical visits are "oral communications" within the meaning of Ohio Rev. Code Ann. § 2933.51(B). Each was uttered by a person exhibiting an expectation that the communication was not subject to interception, under circumstances justifying that expectation: the conversations took place behind closed doors in private exam rooms, concerned a child's confidential medical information, and occurred within physician-patient and hospital-patient relationships that Ohio law treats as confidential. *See* Ohio Rev. Code § 2317.02(B)(1).

144. When Defendants' clinicians activated the Abridge tool, Defendants acquired the contents of those oral communications (that is, information concerning their substance, purport, or meaning, Ohio Rev. Code § 2933.51(G)) through the use of an interception device, and thereby "intercepted" them within the meaning of Ohio Rev. Code § 2933.51(C).

145. The microphone-enabled phones, tablets, and similar devices running the Abridge application, together with the software and cloud infrastructure that captured, transmitted, and processed the audio, are "interception devices" within the meaning of Ohio Rev. Code § 2933.51(D), because they are electronic devices that can be, and were, used to intercept oral communications. Upon information and belief, those devices transmitted the captured audio by radio, including over wireless and cellular networks, and through wire and cable connections to Abridge AI, Inc.'s servers. The Abridge application is not telephone equipment furnished by a communications service provider and used in the ordinary course of business, and transmitting a patient's entire conversation to an outside vendor for that vendor's own commercial use is not part of the ordinary course of any healthcare provider's business.

146. Defendants acted purposely. They selected the Abridge system, contracted with Abridge AI, Inc., configured the system to capture entire patient encounters and transmit them outside Defendants' systems, trained their clinicians to activate it, and deployed it across their facilities with the specific intention that it capture the full contents of patients' and parents' conversations. Defendants thereby intercepted Plaintiffs' and Class Members' oral communications, used interception devices to do so, and procured Abridge AI, Inc. to intercept them, in violation of Ohio Rev. Code § 2933.52(A)(1) and (A)(2).

147. Defendants also used the contents of the intercepted communications, knowing that those contents were obtained through the interception alleged above, in violation of Ohio Rev. Code Ann. § 2933.52(A)(3). Defendants used the contents to generate clinical notes and billing documentation, and disclosed them to Abridge AI, Inc., which, upon information and belief, Defendants permitted to retain and use them to train and improve its own artificial-intelligence models and commercial products.

148. Neither Plaintiffs nor any Class Member gave prior consent to the interception, disclosure, or use of their oral communications, and no court order or other legal authority permitted it.

149. Defendants intercepted Plaintiffs' and Class Members' communications for the purpose of committing each category of act the statute identifies:

a. *Criminal offense.* Defendants intercepted the communications in order to disclose them knowingly to Abridge AI, Inc. in violation of HIPAA, which is a federal crime. 42 U.S.C. § 1320d-6.

b. *Tortious acts.* Defendant committed tortious acts, including but not limited to breach of confidence and intrusion upon seclusion.

c. *Acts in violation of Ohio law.* Defendants intercepted the communications to use and disclose Plaintiffs' and Class Members' protected health information without a valid authorization under 45 C.F.R. § 164.508 and in a manner inconsistent with 45 C.F.R. § 164.502, which Ohio law independently prohibits. Ohio Rev. Code Ann. § 3798.04(A)–(B).

d. *Other injurious acts.* Defendants intercepted the communications in order to deliver children's confidential medical conversations to an outside company for incorporation into a commercial AI training corpus, from which they cannot be retrieved and where remain exposed to re-identification and extraction.

150. The Ohio Wiretap Act's exception is broader than its federal counterpart. Unlike 18 U.S.C. § 2511(2)(d), Ohio Rev. Code Ann. § 2933.52(B)(4) withholds the one-party-consent exemption from interceptions made "for the purpose of committing any other injurious act," whether or not that act is independently criminal or tortious. Defendants' purpose falls within that clause even if it were found to be neither criminal nor tortious.

151. These criminal, tortious, and injurious acts are independent of the interception itself. Interception and disclosure are functionally distinct steps, and the unauthorized disclosure of confidential medical information to a third party is a wrong separate from the act of recording. At the moment Defendants activated the Abridge tool, upon information and belief, they intended

that the intercepted communications would be transmitted to Abridge AI, Inc. and retained and used for its independent commercial benefit.

152. Under Ohio Rev. Code Ann. § 2933.65(A), Plaintiffs and each Class Member are entitled to the following relief: (a) injunctive and other equitable or declaratory relief as is appropriate, including an order requiring Defendants to stop recording patient encounters without all-party informed consent and to secure the deletion of Plaintiffs' and Class Members' recordings, transcripts, and derived data; (b) to recover from Defendants the greater of liquidated damages of $200 per day for each day of violation or $10,000, or the sum of their actual damages and any profits Defendants derived from the violations; (c) punitive damages; and (d) reasonable attorney's fees and other litigation expenses reasonably incurred.

## COUNT III
## BREACH OF CONFIDENCE
**(*On behalf of Plaintiffs and the Class*)**

153. Plaintiffs incorporate and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

154. Medical providers in Ohio have a duty to their patients to keep private, medical information confidential and to not disclose such information to third parties without the patient's informed consent or other applicable legal privilege entitling them to do so. Unauthorized, unprivileged disclosure of medical information learned by a physician or hospital within the physician-patient relationship is tortious.

155. Defendants, at all relevant times, acting through their employed and affiliated physicians and other clinicians, entered into physician-patient relationships with Plaintiffs and Class Members. Defendants, at all relevant times, further entered into hospital-patient relationships with Plaintiffs and Class Members. Plaintiffs and Class Members sought and received medical

care from providers affiliated with Defendants, and in doing so, Plaintiffs and Class Members entrusted Defendants with their confidential medical information for the purpose of obtaining that care.

156. These relationships gave rise to a duty of confidentiality long recognized by Ohio law—a cardinal rule embedded in the physician-patient and hospital-patient relationship.

157. During their medical encounters, Plaintiffs and Class Members disclosed confidential, nonpublic medical information to their pediatric providers, including symptoms, diagnoses, treatment and medication history, family medical history, mental-health information, and other intimate matters. Plaintiffs and Class Members conveyed this information in private examination rooms, behind closed doors, and reasonably understood and expected it would remain confidential between themselves and Defendants.

158. Contrary to their duty as medical providers, Defendants disclosed these confidential, nonpublic medical information and communications, in full and verbatim, to Abridge AI, Inc., a third party with no role in Plaintiffs' and Class Members' care. This disclosure was an affirmative act by Defendants, who selected, deployed, configured and activated the Abridge system and thereby routed their patients' confidential medical communications outside their own walls. Upon information and belief, Defendants permitted Abridge AI, Inc. to retain that information and those communications to use for its own commercial purposes, including training and improving artificial-intelligence models.

159. These disclosures were unauthorized. The Notice Protocol, at most, told patients and/or parents and guardians that an AI tool would be used; it never disclosed that the conversation would be transmitted to an outside company or that the company could retain and use it for its own purposes. Any acquiescence to the use of "AI" does not constitute consent to the disclosure of such

information and communications to a third party, let alone for that third party's commercial benefit.

160. No statutory mandate or common-law duty required Defendants to transmit their patients' confidential medical information to Abridge AI, Inc.

161. Defendants' breaches of confidence were committed negligently, recklessly, and/or intentionally.

162. Defendants' breaches of confidence were a direct and proximate cause of several injuries suffered by Plaintiffs and Class Members, including, but not limited to, invasion of their legally protected privacy interests, emotional distress, humiliation, loss of trust in their healthcare providers, loss of control over confidential medical information and communications, the interference with a confidential relationship, the lost benefit of their implied bargain for confidentiality, and the diminished value of medical services for which they paid.

163. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members were damaged in an amount to be proven at trial. Plaintiffs and Class Members will suffer additional injuries and damages unless the Court grants declaratory judgment and injunctive relief.

## COUNT IV
## INTRUSION UPON SECLUSION
**(*On behalf of Plaintiffs and the Class*)**

164. Plaintiffs incorporate and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

165. Intrusion upon seclusion occurs when one intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs and concerns, if the intrusion would be highly offensive to a reasonable person.

166. Plaintiffs and Class Members engaged in private medical consultations with their physicians in exam rooms and other private clinical environments. These conversations concerned highly personal and sensitive health information, including medical histories, symptoms, diagnoses, treatments, medications, mental health, sexual health, and other intimate matters.

167. Medical examination rooms and doctor–patient consultations are quintessentially private spaces and conversations. Parents and guardians of pediatric patients, and patients, reasonably expect that their conversations in such settings will not be recorded or transmitted to third parties without their knowledge and consent.

168. The intrusions were deliberate and systemic. Defendants authorized and implemented the Abridge system, trained providers to use it, and configured it to record entire encounters and transmit recordings to a vendor.

169. The intrusions were highly offensive to a reasonable person. They captured intimate medical communications in their entirety, in one of the most sensitive contexts recognized by law and society, and were executed covertly, in a manner that involved deception and betrayal of trust.

170. Defendants' motives were commercial and operational, including improving documentation and billing, rather than being protective of patients and their families. Reasonable persons would find it highly offensive when a healthcare provider prioritizes such interests over fundamental privacy rights.

171. As a direct and proximate result of Defendants' intrusion upon seclusion, Plaintiffs and Class Members suffered damages, including invasion of their legally protected privacy interests, emotional distress, mental anguish, anxiety, anger, humiliation, loss of dignity and autonomy, loss of trust in their healthcare providers, and apprehension regarding future medical visits.

172. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members were damaged in an amount to be proven at trial. Plaintiffs and Class Members will suffer additional injuries and damages unless the Court grants declaratory judgment and injunctive relief.

## COUNT V
## BREACH OF CONTRACT IMPLIED IN FACT
**(*On behalf of Plaintiffs and the Class*)**

173. Plaintiffs incorporate and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

174. By accepting Plaintiffs and Class Members as patients and undertaking to provide medical treatment, Defendants entered into an implied contractual relationship with Plaintiffs and Class Members that included an implied promise to maintain the confidentiality of information disclosed in the course of treatment and not disclose it without affirmative consent. The implied contract was not reduced to writing; it arose from the parties' conduct.

175. Plaintiffs and Class Members provided consideration in the form of payment (directly and/or through insurance) for medical services. Plaintiffs and Class Members disclosed sensitive personal and medical information, in reliance on Defendants' implied promise of confidentiality, a promise reflected in the standard of confidentiality universally understood to govern the physician-patient relationship.

176. Defendants breached that implied contract by recording Plaintiffs' and Class Members' confidential medical communications and disclosing them to Abridge and its personnel without Plaintiffs' or Class Members' informed consent and without the safeguards that Defendants impliedly promised to maintain.

177. Plaintiffs and Class Members performed all conditions, covenants, and promises required of them under the implied contract, except to the extent such performance was excused or prevented by Defendants' conduct.

178. As a direct and proximate result of Defendants' breaches of contract, Plaintiffs and Class Members have suffered injuries, including but not limited to the lost benefit of their bargain for confidential medical treatment. Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial. Plaintiffs and Class Members will suffer additional injuries and damages unless the Court grants declaratory judgment and injunctive relief.

## COUNT VI
## BREACH OF CONTRACT IMPLIED IN LAW
**(*On behalf of Plaintiffs and the Class*)**

179. Plaintiffs incorporate and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

180. This claim is pled in the alternative to Plaintiffs' claim for breach of contract implied in fact.

181. Plaintiffs and Class Members suffered a detriment and conferred a benefit on Defendants by providing the confidential medical information that Defendants used, through the Abridge platform, to generate operational and financial benefits, including reduced clinician documentation time, improved billing capture, and other cost savings and efficiencies Defendants would not otherwise have realized.

182. Defendants appreciated, knew of, and voluntarily accepted and retained that benefit under circumstances making it inequitable for Defendants to retain it without payment of its value, given that the benefit was obtained through the unauthorized recording, transmission, and disclosure of Plaintiffs' and Class Members' confidential medical information, without informed

consent and in violation of the statutory and common-law duties described above. Accordingly, this benefit was conferred on Defendants to Plaintiffs' and Class Members' detriment.

183. Plaintiffs and Class Members have no adequate remedy at law to the extent any of their claims sounding in tort or statute are found not fully to compensate them for the benefit Defendants obtained at their expense.

184. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered detriments and Defendants have been unjustly enriched. Principles of justice, equity, and good conscience require Defendants to provide restitution and disgorgement of the amount by which they were unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendant as follows:

A. An Order certifying the Class, and appointing the Plaintiff as Class Representative and her Counsel as Class Counsel;

B. A declaration that Defendants' recording, interception, disclosure, and use of Plaintiffs' and Class Members' confidential medical information and communications through the Abridge platform, as alleged herein, are unlawful;

C. Injunctive relief, including, but not limited to, injunctive and other equitable relief enjoining Defendants from using the AI tools described herein, and any other order that is necessary to protect the interests of Plaintiffs and Class Members;

D. An award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, in an amount to be determined at trial;

E. Restitution and disgorgement of all amounts by which Defendants were unjustly enriched;

F. An award of reasonable attorneys' fees, costs, and litigation expenses;

G. Pre-judgment interest and post-judgment interest on all amounts awarded at the highest rate allowed by law; and

H. All such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs and the Class Members demand a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
*Trial Attorney*
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

Philip J. Krzeski (0095713)
Tara D. Baker (*pro hac vice* forthcoming)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave. S, Unit 1700
Minneapolis, MN 55401
Tel: (612) 339-7300
Fax: (612) 336-2940
pkrzeski@chestnutcambronne.com
tdbaker@chestnutcambronne.com

Alexander J. Garcia (*pro hac vice* forthcoming)
Tyler J. Bean (*pro hac vice* forthcoming)
**SIRI & GLIMSTAD LLP**
1650 Market St., Ste. 3600 #17136373
Philadelphia, PA 19103
Tel: (215) 402-7926
agarcia@sirillp.com
tbean@sirillp.com

*Counsel for Plaintiffs and the Putative Class*